IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )  No. 2:20-cr-00154-LPR |
| | ) |
| **JESSICA LYN MATHES** | ) |

**ORDER**

Defendant Jessica Lyn Mathes is scheduled to stand trial for possession of methamphetamine (actual) with intent to distribute. She asks this Court to suppress the methamphetamine found on her person during a search incident to arrest.[1] She also asks this Court to suppress statements she made during a subsequent police interview. On September 10, 2021, the Court held a suppression hearing.[2] For the reasons that follow, the Court DENIES the Motion to Suppress.

*Findings of Fact*

1. This case arises from a traffic stop conducted by Detective Jamie Counce.[3]

2. Detective Counce has ten years of law enforcement experience and has worked for the West Memphis Police Department for eight years.[4]

3. Detective Counce has been assigned to the Narcotics Division of the West Memphis Police Department for the last six years.[5] The Narcotics Division investigates drug crimes and

---

[1] Def.'s Mot. to Suppress (Doc. 33).

[2] Sept. 10, 2021 Hr'g Tr.

[3] *Id.* at 4.

[4] *Id.* at 2.

[5] *Id.*

those who commit them.[6]  Detective Counce's duties also include "performing traffic stops."[7]

4. Detective Counce has performed "hundreds of traffic stops" and has participated in "over a hundred drug investigations."[8]

5. At around 7:00 p.m. on February 28, 2020, Detective Counce was watching traffic in the "area of U.S. Highway 70 and Masner Road."[9]

6. Detective Counce observed a blue truck (a Dodge Ram) veer off a roadway "onto the shoulder and jerk back into the lane of traffic."[10]  Detective Counce saw that the truck's license plate was "damaged and difficult to read."[11]

7. Detective Counce believed that he witnessed two traffic violations: careless driving and "improper display of a license plate."[12]

8. At approximately 7:05 p.m., Detective Counce initiated a traffic stop, and the truck stopped about a minute later at 7802 U.S. Highway 70.[13]

9. Detective Counce could not recall whether he had a ticket book with him at the time

---

[6] *Id.* at 3.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 4–5.

[10] *Id.* at 4.

[11] *Id.* at 4, 30.

[12] *Id.* at 6.  Under Arkansas Code Annotated section 27-51-104(a), "[i]t shall be unlawful for any person to drive or operate any vehicle in such a careless manner . . . as to evidence a failure to maintain proper control on the public thoroughfares . . . in the State of Arkansas."  Under Arkansas Code Annotated section 27-51-302(1), "[a] vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that movement can be made with safety . . . ."  Under Arkansas Code Section 27-14-716, a license plate "shall be maintained free from foreign materials and in a condition to be clearly legible."

[13] Sept. 10, 2021 Hr'g Tr. at 4.  The dispatch logs from the Crittenden County Sheriff's Office and the West Memphis Police Department record that Detective Counce was dispatched at around 7:28 p.m.  Gov't's Hr'g Exs. 3, 5.  The Court finds that this information is erroneous based on Detective Counce's credible testimony.  Moreover, Ms. Mathes agrees that the stop occurred "around 7:05 p.m."  Def.'s Mot. to Suppress (Doc. 33) at 2.

of the stop.[14]  (Ultimately, Detective Counce did not issue a citation for either traffic violation.[15])

10. Once the truck stopped, Detective Counce walked up to the driver's door and made contact with the truck's three occupants.[16]  Clinton Humes, who is not a defendant in this case, was the driver.[17]  Juston Ashburn, who is not a defendant in this case, was sitting in the back seat.[18]  Ms. Mathes, who is the Defendant in this case, was sitting in the front passenger seat.[19]

11. Upon first making contact with the truck's occupants, Detective Counce observed that Mr. Humes was nervous.[20]  "[H]is hands were trembling, shaking."[21]

12. Detective Counce identified himself and told Mr. Humes the stop was because of the erratic driving and the damaged license plate.[22]  Mr. Humes responded by saying that he "veered off the roadway because he was eating."[23]  Detective Counce recalls that there was food in the truck near Ms. Mathes.[24]  Mr. Humes did not say anything about the license plate.

13. Detective Counce then asked for the occupants' identifications and radioed their identifications (along with the truck's license plate number) to dispatch to obtain background information on the occupants and on the truck.[25]  Detective Counce cannot recall if the occupants

---

[14] Sept. 10, 2021 Hr'g Tr. at 30.

[15] Id.

[16] Id. at 4.

[17] Id.

[18] Id.  The hearing transcript first reflects the name Justin Ashbrook for the back-seat passenger.  Id.  Later in the hearing and in the briefing, this same person is referred to as either Justin or Juston Ashburn.  Id. at 5; Def.'s Mot. to Suppress (Doc. 33) at 2; Gov't's Resp. to Def.'s Mot. to Suppress (Doc. 42) at 1.  The Court will refer to this passenger as Mr. Ashburn.

[19] Sept. 10, 2021 Hr'g Tr. at 4.

[20] Id.

[21] Id. at 7.

[22] Id.

[23] Id.

[24] Id.

[25] Id. at 5–6.

produced driver's licenses or just told Detective Counce their names and dates of birth.[26]

14. While waiting for the results from dispatch, Detective Counce began speaking with the occupants.[27] Detective Counce asked the occupants if they had ever been arrested, and if so, for what.[28] Ms. Mathes (the Defendant) and Mr. Ashburn (the back-seat passenger) both said that they had been arrested for drugs.[29]

15. Detective Counce then learned from dispatch that Mr. Ashburn was on "active supervision probation."[30] Detective Counce did not learn anything from dispatch about Ms.

---

[26] *Id.* at 8.

[27] *Id.* at 5.

[28] *Id.*

[29] *Id.* The record does not reveal whether Ms. Mathes or Mr. Ashburn had drug convictions.

[30] *Id.* Detective Counce could not say exactly how long it took to receive the results from dispatch, but he did say that it can take two or three minutes. *Id.* at 6. The Crittenden County Sheriff's Office dispatch log makes no mention of Detective Counce running the occupants' identifications. Gov't's Hr'g Ex. 3. The West Memphis Police log shows only that dispatch ran the driver's name, and the log reflects that dispatch ran the wrong name (Clinton Hughes versus Clinton Humes). Gov't's Hr'g Ex. 5. Additionally, the log reflects that Mr. Humes's (incorrect) name and the truck's license plate were not ran until after 7:50 p.m. *Id.* The Court finds that the dispatch logs are inaccurate and incomplete. This finding is based in large part on Detective Counce's credible, clear account of the traffic stop. The Court credits Detective Counce's testimony that he ran the occupants' identifications at the beginning of the encounter. With respect to discrepancies between his account and the dispatch logs, Detective Counce testified as follows: "[s]ometimes dispatchers don't hear you. Sometimes dispatchers are too busy to plug something in. It's very common." Sept. 10, 2021 Hr'g Tr. at 30. The Court finds this explanation credible as well. It is more likely than not that Detective Counce asked dispatch to run the information, and dispatch did run the occupants' information and the truck's information, near the outset of the encounter (around 7:10 p.m.). It is more likely than not that dispatch simply did not record these early information checks.

In addition to Detective Counce's testimony, there are other reasons to believe the logs are incomplete or inaccurate. For example, an important aspect of Detective Counce's account (which is contrary to the logs) is not contested by Ms. Mathes. Ms. Mathes acknowledges that Detective Counce learned from dispatch that Mr. Ashburn was on probation *before* Detective Counce conducted any searches, found any contraband, arrested anyone, or called for a female officer to search Ms. Mathes. Def.'s Mot. to Suppress (Doc. 33) at 2–3. Because the call for a female officer is the first entry in the West Memphis log, the information on Mr. Ashburn must have been provided by dispatch before (not after) that point. Nothing in the record can explain how Detective Counce learned about Mr. Ashburn's probation status absent receiving that information from dispatch. This is yet further indication that the identity checks occurred, and occurred earlier than the dispatch records show.

The errors in the dispatch logs are not terribly surprising. Indeed, the dispatch logs themselves are replete with questionable information. The Crittenden County Sheriff's log shows that both Detective Counce and a Lieutenant Darrell Prewitt were dispatched, enroute, and arrived at the call at 7:29:18 p.m. Gov't's Hr'g Ex. 3. It is impossible for all of those activities to occur simultaneously. It is much more likely that dispatch recognized the gravity of the stop and began "plugging in" information related to the traffic stop around this time. The West Memphis Police log indicates that Detective Counce was dispatched at 7:28:16 p.m. and arrived at the scene twenty-three seconds later. Gov't's Hr'g Ex. 5. That's a fast response time, likely too fast. The two logs also show a different time for

4

Mathes (the front passenger and the Defendant in this case) and Mr. Humes (the driver).[31]

16. Detective Counce asked Mr. Humes to step out of the truck and follow Detective Counce to the back of the truck.[32] Mr. Humes complied.[33]

17. Detective Counce asked Mr. Humes about where he was heading.[34] Mr. Humes responded by saying that "Ms. Mathes had just been driving his truck to come pick him up from [C]risp [C]ontractors, where he worked, and they were heading back towards St. Francis County . . . ."[35]

18. Detective Counce then asked Mr. Humes for consent to search the truck.[36] Mr. Humes consented.[37]

19. At the suppression hearing, Detective Counce was asked why he requested consent to search the truck.[38] Detective Counce stated: "Their history of drugs, Mr. Humes being nervous, the back passenger, Mr. Ashburn, being on probation."[39] These circumstances led Detective Counce to "believe[] there might be narcotics possibly in the vehicle."[40]

20. After getting consent to search the truck, Detective Counce asked Ms. Mathes and

---

Detective Counce's dispatch and arrival. *Compare* Gov't's Ex. 3, *with* Gov't's Ex. 5. The two logs show different times for when the occupants were transported to the police station. *Id.* So, the logs are inconsistent with one another and inconsistent with information that is undisputed by the parties, such as the time Detective Counce initiated the traffic stop (7:05 p.m.). It is more likely than not that these logs do not reflect the sum of Detective Counce's communications with dispatch, nor do they paint an accurate picture of the time frame.

[31] Sept. 10, 2021 Hr'g Tr. at 8.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* Mr. Humes stated that he owned the truck. *Id.* at 9.

[36] *Id.* at 8, 36.

[37] *Id.* at 8–9.

[38] *Id.* at 9.

[39] *Id.*

[40] *Id.*

Mr. Ashburn to exit the truck.[41]

21. Detective Counce then sought Mr. Ashburn's consent to search his person.[42] The record is unclear as to whether Mr. Ashburn gave consent.

22. In any event, Detective Counce searched Mr. Ashburn and found a piece of cardboard in Mr. Ashburn's groin area.[43] Mr. Ashburn told Detective Counce that the cardboard held methamphetamine.[44]

23. Detective Counce seized this evidence and testified that it "appeared to be[,] through [his] training and experience[,] methamphetamine, [a] crystalline substance."[45]

24. Detective Counce arrested Mr. Ashburn.[46]

25. Detective Counce then began the consented-to search of the truck.[47]

26. In the center console—between Mr. Humes's seat and Ms. Mathes's seat—Detective Counce located a digital scale.[48]

27. United States' Exhibits 1 and 2 are accurate depictions of the digital scale before and after Detective Counce removed the scale from the box in which it was stored.[49] The box was a cardboard box showing the brand and model of the scale.[50] It appears to be the box in which the scale was originally sold.

28. After removing the scale from its box, Detective Counce inspected the scale and

---

[41] *Id.* at 10.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.* at 10, 37.
[49] Gov't's Hr'g Exs. 1–2.
[50] *Id.*

saw what he believed to be methamphetamine residue on the scale itself.[51]

29. Photographic evidence shows some sort of white substance on the surface of the scale.[52] Detective Counce testified that the white substance was a "clear crystalline substance" and that, based on his training and experience, the look of the substance was consistent with methamphetamine.[53]

30. Detective Counce could not recall whether he had a field test kit with him on the night of the traffic stop.[54] A field test kit is used to test a substance to determine if it is a narcotic.[55]

31. Detective Counce did not use a field test kit during the traffic stop to confirm whether the substance was in fact methamphetamine.[56]

32. After finding the scale with what Detective Counce believed to be methamphetamine residue, Detective Counce arrested Ms. Mathes (the Defendant) and Mr. Humes (the driver) for possession of drug paraphernalia.[57]

33. Detective Counce then contacted dispatch to request a female officer to perform a search on Ms. Mathes.[58] The call for a female officer occurred at 7:28:40 p.m.[59] Approximately

---

[51] Sept. 10, 2021 Hr'g Tr. at 10.

[52] Gov't's Hr'g Ex. 2.

[53] Sept. 10, 2021 Hr'g Tr. at 37.

[54] *Id.* at 32.

[55] *Id.*

[56] *Id.* at 14.

[57] *Id.* at 14–15.

[58] *Id.* at 15.

[59] Gov't's Hr'g Ex. 5.

twenty-two minutes had elapsed between the truck initially stopping and the arrest of Ms. Mathes.

34. West Memphis Police Officer Lilian Blazin responded to the scene.[60]

35. Officer Blazin ushered Ms. Mathes to the front of Officer Blazin's car.[61] Officer Blazin asked Ms. Mathes if she had anything on her that "will poke, stab or hurt [Officer Blazin]."[62] Officer Blazin had not given a *Miranda* warning to Ms. Mathes at this time.[63] No other officer had either.

36. Ms. Mathes told Officer Blazin that there was something in Ms. Mathes's "bra and also in the front of her pants."[64]

37. Officer Blazin discovered that Ms. Mathes had a small plastic bag in her bra that contained a substance.[65] Ms. Mathes "also had a larger bag in the front of her pants containing the same substance."[66] Officer Blazin believed that the bags contained methamphetamine and gave the bags to Detective Counce.[67]

38. After the bags were seized, Ms. Mathes, Mr. Ashburn, and Mr. Humes were transported to the police department.[68]

39. At the police department, Detective Counce advised Ms. Mathes of her *Miranda* rights.[69] Ms. Mathes signed a "Waiver of Rights" form, indicating that she knew and understood

---

[60] Sept. 10, 2021 Hr'g Tr. at 47–48.
[61] *Id.* at 48–49.
[62] *Id.* at 52.
[63] *Id.* at 51.
[64] *Id.* at 48.
[65] *Id.* at 49.
[66] *Id.*
[67] *Id.* at 50.
[68] *Id.* at 21.
[69] *Id.* at 22.

her "Rights" and was "willing to make a statement and answer questions."[70]

40. Ms. Mathes then told Detective Counce that "the digital scale belonged to her and that she did sell methamphetamine."[71] Ms. Mathes also admitted that the methamphetamine found on her was hers.[72]

41. The United States subsequently indicted Ms. Mathes for possession with intent to distribute methamphetamine.[73] The Grand Jury returned a True Bill on the indictment.[74]

*Conclusions of Law*

Ms. Mathes's principal argument is that Detective Counce unreasonably prolonged the traffic stop without reasonable suspicion and thus violated her Fourth Amendment rights.[75] From this premise, she asserts that the elongated portion of the traffic stop was an unconstitutional seizure and any evidence found or statements made after the seizure became unconstitutional represent fruits of the poisonous tree. The Court disagrees.

Ms. Mathes does not contest that the traffic stop began as a constitutional seizure.[76] Indeed, she essentially concedes the point, saying that "the action of Mr. Humes veering off of the roadway onto the shoulder of the roadway and then coming back into traffic is likely [grounds for] a reasonable traffic stop."[77] And while Ms. Mathes doesn't mention it, the damaged license plate similarly provided justification for a custodial traffic stop. This is because "[a] traffic stop

---

[70] Gov't's Hr'g Ex. 4.

[71] Sept. 10, 2021 Hr'g Tr. at 22, 24.

[72] *Id.*

[73] Indictment (Doc. 3).

[74] True Bill (Doc. 4) (sealed).

[75] Def.'s Mot. to Suppress (Doc. 33) at 8.

[76] *See* Sept. 10, 2021 Hr'g Tr. at 64–65 (stating that Ms. Mathes is not arguing that Detective Counce failed to articulate a traffic violation).

[77] Def.'s Mot. to Suppress (Doc. 33) at 5.

generally must be supported by 'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'"[78]

Ms. Mathes's concession is far from the end of the matter. A traffic stop "that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."[79] "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns."[80] So, a "traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket."[81]

An officer's mission in a traffic stop includes "ordinary inquiries incident to [the traffic stop]."[82] The Supreme Court says these inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[83] In addition to this non-exhaustive list from the Supreme Court, "[the Eighth Circuit] has at least suggested that travel-related questions remain a 'permissible' part of routine traffic stops . . . ."[84]

---

[78] *United States v. Cox.*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005) (quoting *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004), *abrogated on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015))).

[79] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[80] *Rodriguez*, 575 U.S. at 354 (quoting *Cabellas*, 543 U.S. at 407).

[81] *Id.* (brackets in original) (quoting *Cabellas*, 543 U.S. at 407).

[82] *Id.* at 355–54 (brackets in original) (quoting *Cabellas*, 543 U.S. at 408).

[83] *Id.* at 355.

[84] *United States v. Callison*, 2 F.4th 1128, 1131 n.2 (8th Cir. 2021).

"[I]nvestigating general criminal wrongdoing is outside a routine traffic stop's purposes."[85] But that doesn't mean a police officer can't ask questions or make general inquiries about unrelated potential crimes during a traffic stop. Although the length of a traffic stop cannot constitutionally extend beyond the time frame it takes to make ordinary inquiries *related to the traffic stop*, that does not prevent officers from making other unrelated inquiries *during the same time frame*. At least, this is true in the Eighth Circuit, where "an officer may conduct certain unrelated inquiries absent reasonable suspicion, unless doing so 'prolongs the stop.'"[86]

Here, Detective Counce did not unreasonably prolong the traffic stop. Detective Counce's mission was to investigate Mr. Humes's erratic driving and the damaged license plate. The fact that Detective Counce ultimately did not write a ticket for these alleged infractions is a red herring. He had a right to investigate to determine whether to write a ticket. And he had a right to investigate safety concerns on the road. As the Supreme Court held in *Rodriguez*, part of Detective Counce's mission involved running the occupants' information to confirm their identities and check for outstanding warrants or other background issues. That's what Detective Counce did. While waiting for dispatch to run the information, Detective Counce asked the occupants if they had been previously arrested. Even if this questioning could be considered unrelated to the traffic stop, the questioning in no way prolonged the stop.[87]

During the time required to hear back from dispatch, Detective Counce learned from Ms. Mathes (the Defendant and front-seat passenger) and Mr. Ashburn (the back-seat passenger) that they both had been previously arrested for drugs. Detective Counce then learned from dispatch

---

[85] *Id.*

[86] *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting *Rodriguez*, 543 U.S. at 355).

[87] It's not clear the questions were unrelated to the traffic stop. If, for example, the driver admitted to prior DWI arrests, that information would certainly have had a bearing on the traffic stop, including being a potential clue related to the erratic driving issue.

11

that Mr. Ashburn was on active probation. All of this information was learned by Detective Counce during the time needed for appropriate traffic stop inquiries.

Ms. Mathes does not really argue otherwise. Her argument is focused on what happened next. Detective Counce asked Mr. Humes to step out of the vehicle and very briefly asked him about his travel destination. The best reading of Eighth Circuit precedent is that such questioning is a "permissible" part of the traffic stop even after the Supreme Court's decision in *Rodriguez*.[88] And this makes sense. Questions about the occupants' place of departure and destination can aid an officer's determination of whether to write a ticket and whether there is a minor or serious threat to public safety on the roads. For example, the travel-related questioning could have theoretically revealed that the occupants had been traveling a long distance, which could have indicated that the erratic driving was the result of a lack of sleep as opposed to being the result of eating while driving. Or the questioning could have revealed that the truck was coming from a bar, which would have suggested possible drunk driving as a cause of the veering off the road. Additionally, the detective's questioning could have revealed a long journey to go, which might have made the damaged-license-plate issue a bigger deal. The point is that travel-related questioning (at least if it is brief) is an objectively reasonable component of a traffic stop. Accordingly, Detective Counce's travel-related questioning did not unreasonably prolong the traffic stop, and thus he did not need reasonable suspicion of other criminal activity to justify this brief questioning.[89]

In response to the one or two travel-related questions he asked, Detective Counce learned that the two occupants with drug-arrest histories were traveling together prior to picking up Mr.

---

[88] *Callison*, 2 F.4th at 1131 n.2.

[89] This analysis is not undermined by the fact that the questioning occurred at the rear of the truck. Controlling precedent is clear that an officer can question a driver in the driver's car, outside the car, or in the patrol car so long as the questioning itself is not an unreasonable elongation of the traffic stop. *See United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990) (stating that routine questioning in an officer's patrol car "were lawful as incidental to the processing of a routine traffic stop").

Humes from work. At this point, the travel-related questioning stopped. Detective Counce then asked for Mr. Humes's consent to search the truck. Mr. Humes complied. The request for consent that occurred at the tail end of the travel-related questioning did not unreasonably prolong the traffic stop. So Detective Counce did not need reasonable suspicion of other criminal activity to justify this request. If Mr. Humes had said no, and Detective Counce did anything further, then that might count as prolonging the traffic stop. But even *Rodriguez* does not go so far as preventing an officer from asking for consent to search a vehicle as the traffic stop is wrapping up. And once consent is given, the search itself does not constitute an elongation of the traffic stop by law enforcement.[90] The traffic stop is over, and now there is just a consensual search going on.

Even if the two-second request for consent could be seen as prolonging the traffic stop, Detective Counce had by that time acquired additional facts that would give a reasonable officer reasonable suspicion to believe that other criminal activity was afoot. The Eighth Circuit acknowledges that "[a]n officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered."[91] "The 'suspicious facts' must be specific and articulable facts, which, taken together with rational inferences from those facts, amount to reasonable suspicion that further investigation is warranted."[92]

Detective Counce's permissible actions uncovered "suspicious facts" that warranted further investigation. Recall that Detective Counce stopped the truck because it veered off the road and because the license plate was damaged and difficult to read. Alone, these traffic

---

[90] *United States v. Salkil*, 10 F.4th 897, 899 (8th Cir. 2021) ("Once police lawfully secured consent to search, any delay occasioned by the search did not constitute an unlawful extension of the seizure.").

[91] *Magallon*, 984 F.3d at 1278 (quoting *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017)).

[92] *Id.* (cleaned up).

13

infractions are not enough to raise the specter of criminal activity unrelated to the traffic infractions. They are, however, a piece of the reasonable-suspicion puzzle. For example, in light of the previous drug arrest information that Detective Counce learned, the damage to the license plate could have been an attempt to obscure the vehicle's information in an effort to engage in drug activity without being identified.

Another piece of the reasonable-suspicion puzzle is Mr. Humes's significant and noticeable nervousness. It is true that nervousness in and of itself is not enough to create reasonable suspicion of criminal activity. But Mr. Humes's nervousness can be considered with and added to other independent indicators of criminal activity. And such independent indicators presented themselves, as discussed above and below.

Before asking for consent to search the truck, Detective Counce knew that two of the three occupants had prior drug arrests. Again, prior criminal history by itself is insufficient to meet the reasonable-suspicion standard, but it does add another layer of suspicion. Plus, Detective Counce learned that the two occupants with drug histories were fraternizing before they picked Mr. Humes up from work. (And he learned this from the driver who might have been trying to distance himself from the other two persons in the truck.) It is not uncommon for people with drug histories to consume drugs in vehicles or to possess drugs. Reasonable officers know this.

Taken individually and in isolation, none of the facts above likely create reasonable suspicion of criminal activity beyond the traffic infractions. But in their totality, they give a reasonable officer in Detective Counce's position reasonable suspicion that other illegal activity, specifically drug use or possession, was occurring. At night, a truck with a partially concealed license plate and two passengers with prior drug arrests, veered off the road. Upon being stopped by the police, the driver was visibly shaking and tried to make clear to the police that the two

passengers with prior drug arrests had been in the truck alone (without the driver) for a significant amount of time. All of this put together, including the driver's potential attempt to distance himself from the other passengers, is enough to meet the reasonable-suspicion standard.

In any event, even if the two-second request for consent counts as prolonging the traffic stop (it does not) and even if Detective Counce lacked reasonable suspicion of other criminal activity (he did not), Ms. Mathes still does not prevail. Mr. Humes's voluntary consent "was a sufficient act of freewill to purge the taint of any illegal detention."[93] The Eighth Circuit says that an illegal seizure "is only the start" of the Fourth Amendment analysis, "for the evidence seized from [the truck] need not be suppressed if [Mr. Humes's] voluntary consent provided an independent basis for the search of [the truck]."[94] What this means for Ms. Mathes is that the

---

[93] *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001).

[94] *Id.* The Eighth Circuit places the burden on the government to prove, by a preponderance of the evidence, "that consent to search was freely given." *Id.* Some of Mr. Humes's "personal characteristics are relevant to the issue of his consent, including (1) his age; (2) his general intelligence and education; (3) whether he was under the influence of drugs or alcohol; (4) whether he was informed of his Miranda rights; and (5) whether he had experienced prior arrests and was thus aware of the protections that the legal system affords to suspected criminals." *Id.* The environment where Mr. Humes "allegedly consented to the search is also important, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently [] as the search occurred." *Id.* (mistake omitted).

With respect to Mr. Humes's personal characteristics, Mr. Humes was driving a truck he owned, which means that it is more likely than not that he is an adult. (Ms. Mathes does not present evidence or argument that Mr. Humes was a minor.) This favors a finding of voluntariness. The record is silent as to Mr. Humes's intelligence and education. This factor is a wash. Nothing in the record suggests that Mr. Humes was intoxicated when he consented to the search. That Mr. Humes was not intoxicated cuts in favor of a finding of voluntariness. Mr. Humes was not given *Miranda* rights before he consented to the search. This cuts against voluntariness. Mr. Humes's background check came back negative for warrants, so it is possible that Mr. Humes "had not experienced prior arrests." *Id.* Again, this leans against voluntariness. With respect to the environment in which the consent was given, Mr. Humes was detained for Fourth Amendment purposes, but he was not handcuffed or otherwise limited in his mobility. This factor leans towards a voluntariness finding. Detective Counce neither threatened nor made "promises or misrepresentations" to Mr. Humes. *Id.* This factor also favors a voluntariness finding. So too does the fact that Mr. Humes was not under arrest when he consented. The consent occurred near a public highway. This also points towards a voluntariness finding. Finally, nothing in the record indicates that Mr. Humes subsequently protested or otherwise exhibited any indication that the consented-to search was in anyway untoward.

Ms. Mathes does not argue that Mr. Humes did not give consent. Nor does she argue that Mr. Humes's consent was coerced or otherwise unlawfully procured. And the factorial test above leads the Court to conclude that Mr. Humes's consent was freely given. On top of that, Ms. Mathes would not have standing to challenge the search of the truck. *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) ("The United States Supreme Court has

15

driver's consent to search the truck he owned is a break in the causal chain between the alleged unconstitutional prolonging of the traffic stop and the evidence ultimately seized from Ms. Mathes when she was arrested.

Ms. Mathes's secondary argument is that Detective Counce lacked probable cause to arrest her and that any evidence procured based on this unlawful arrest should be suppressed.[95] "Probable cause is required for a warrantless arrest."[96]  Probable cause exists "'when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'"[97]  The Eighth Circuit "does not require that arresting officers witness a crime or have all the evidence to sustain a conviction; instead, officers only need a 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity[.]'"[98]  "Law enforcement officers have 'substantial latitude in interpreting and *drawing inferences from* factual circumstances.'"[99]  The factual circumstances here would lead a reasonable officer to believe that Ms. Mathes possessed drug paraphernalia.  Here's what Detective Counce knew prior to placing Ms. Mathes under arrest.

First, Detective Counce witnessed the truck being driven erratically at night, with a license plate that was partially unreadable.  Even though food was found in the car, Detective Counce was not required to take at face value Mr. Humes's explanation that he veered off the road because he was eating.  And there is no explanation in the record for the defective license plate.  These

---

explicitly determined that a person has no reasonable expectation of privacy in an automobile belonging to another.").

[95] Sept. 10, 2021 Hr'g Tr. at 68.

[96] *United States v. Green*, 9 F.4th 682, 690 (8th Cir. 2021).

[97] *Id.* (quoting *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012)).

[98] *Id.* (brackets original) (quoting *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013)).

[99] *Id.* (brackets and emphasis in original) (quoting *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (quoting *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997))).

circumstances can be indicative of criminal activity if coupled with other facts.

Second, Mr. Humes appeared to be very nervous. It is true that nervousness alone does not provide probable cause for an arrest (especially the arrest of another person), but here it adds to other indicators (discussed below) that drug-related activities were taking place in the truck.

Third, Detective Counce knew that both Ms. Mathes (the Defendant) and Mr. Ashburn (the back-seat passenger) had histories of drug arrests. This directly implicates Ms. Mathes. Criminal history alone does not chin the bar on probable cause. But it is another fact pointing to the real-world likelihood that Ms. Mathes possessed drugs or drug paraphernalia.

Fourth, and critically, before searching the truck, Detective Counce seized methamphetamine from Mr. Ashburn (the back-seat passenger).[100] This seizure is a pivotal turn of events. Now, Detective Counce had strong confirmation that drugs were inside the truck at the time the traffic stop began.

Fifth, Detective Counce knew that Ms. Mathes had, earlier that night, been driving the truck with Mr. Ashburn (who had drugs on him) as the only passenger. This places Ms. Mathes in control of the truck shortly before the traffic stop. It is not as though she just hopped in the truck minutes before the truck was stopped.

Sixth, during the consented-to-vehicle search, Detective Counce found a scale in the center console located in between Mr. Humes's seat and Ms. Mathes's seat. Based on his experience and training, Detective Counce saw a white substance that he believed to be methamphetamine residue on the surface of the scale. It is true that Detective Counce did not use a field test to presumptively confirm that the white substance was methamphetamine. But Detective Counce had just found a

---

[100] Ms. Mathes does not contest the search of Mr. Ashburn. Nor could she. She would not have standing to do so. *See United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999) ("Fourth Amendment rights may not be vicariously asserted.").

scale in a vehicle where two of the three occupants had a history of drug arrests. And Detective Counce had also just found methamphetamine on Mr. Ashburn.

That's more than enough for probable cause to believe that the scale was being used for drug purposes and was thus drug paraphernalia. It is also more than enough for probable cause to believe that the scale belonged to Ms. Mathes. She was recently driving Mr. Ashburn, who was found with methamphetamine on him. Moreover, the scale was found in close proximity to where she was sitting when the traffic stop began. It's true that Detective Counce arrested Mr. Humes and Ms. Mathes for possessing the same item of paraphernalia. The fact that the scale could have belonged to Mr. Humes does not negate the fact that probable cause existed to conclude it belonged to or was being possessed by Ms. Mathes.

Because the Court concludes that Ms. Mathes's arrest comported with the Constitution, Officer Blazin's subsequent search of Ms. Mathes was constitutional. The Supreme Court makes clear that "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; *that intrusion being lawful*, a search incident to the arrest requires no additional justification."[101] Ms. Mathes was lawfully arrested, so the search was constitutional.[102] Therefore, the methamphetamine found during the search will not be suppressed.[103]

In light of the foregoing, Ms. Mathes cannot possibly succeed in getting her post-*Miranda*

---

[101] *Virginia v. Moore*, 553 U.S. 164, 177 (2008) (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)).

[102] In her Motion to Suppress brief, Ms. Mathes originally argued that the search was unconstitutional under *Terry v. Ohio*, which held that officers who briefly detain a suspect based on reasonable suspicion may reasonably "search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual . . . ." 392 U.S. 1, 27 (1968); Def.'s Mot. to Suppress (Doc. 33) at 6–7. But the government is not suggesting that the search of Ms. Mathes was authorized under *Terry*. Gov't's Resp. to Def.'s Mot. to Suppress (Doc. 42) at 9. The government's point is that the search was incidental to a lawful arrest. *Id.*

[103] Additionally, to the extent that Ms. Mathes contends that Officer Blazin should have given Ms. Mathes a *Miranda* warning before asking whether Ms. Mathes had any sharp objects on her, Eighth Circuit precedent forecloses that argument. Under the public-safety exception to *Miranda*, "a suspect's answers to questions from a police officer are admissible in the absence of a *Miranda* warning so long as the questions asked of the suspect are 'reasonably prompted by a concern for public safety.'" *United States v. Williams*, 181 F.3d 945, 953 (8th Cir. 1999) (quoting *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.1992) (quoting *New York v. Quarles*, 467 U.S. 649, 656

statements thrown out as fruits of the poisonous tree. The Court concludes that: (1) the traffic stop was not unreasonably prolonged, (2) probable cause existed for Ms. Mathes's arrest, (3) Officer Blazin was not required to give Ms. Mathes *Miranda* warnings before asking about sharp objects, and (4) the search of Ms. Mathes was incidental to her arrest. Thus, Ms. Mathes has no viable argument that her subsequent statements to Detective Counce *after* Ms. Mathes signed a waiver of rights were obtained in violation of the Constitution.

*Conclusion*

Defendant's Motion to Suppress is DENIED in its entirety.

IT IS SO ORDERED this 13th day of October 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

(1984))). A reasonable officer in Officer Blazin's position would be concerned that Ms. Mathes, a person under arrest for possession of drug paraphernalia, could have sharp objects, such as needles, secreted on her person. Sharp, unknown objects can pose a serious threat to an officer. As such, Officer Blazin's questions fall squarely within the public-safety exception to *Miranda*.